IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No. 6:13-cr-03123-MDH |
| JOSHUA WILLIAM VAWTER, and ANGELO CHARLES VETRANO, | ) ) ) ) |
| Defendants. | ) ) |

# ORDER

Before the Court is Defendant Vetrano's Motion to Suppress and/or Dismiss the Indictment (Doc. 36) and Defendant Vawter's Motion to Suppress and/or Dismiss the Indictment (Doc. 41). Defendants seek to suppress the 200 pounds of marijuana found inside the airplane in which they were traveling, on grounds that such evidence was discovered as the result of an unlawful detention. Defendants advance numerous arguments why the detention was unlawful including: lack of reasonable suspicion, reasonable suspicion derived from unlawful means, and excessive detention under *Terry*. Defendants further seek a *Franks* hearing in order to ascertain the identity and veracity of the confidential informant from whom the authorities received information. In an alternative argument, Defendants seek to dismiss the indictment on equal protection grounds due to alleged selective prosecution of marijuana offenses proscribed by 21 U.S.C. § 841.

Pursuant to the governing law and in accordance with Local Rule 72.1 of the United States District Court for the Western District of Missouri, Defendants' motions were referred to the United States Magistrate Judge for preliminary review under 28 U.S.C. § 636(b). The parties submitted briefs reflecting their positions (Docs. 36, 37, 39, 41, 42) and Magistrate Judge Rush

held a suppression hearing. (Doc. 50). Following the hearing, the parties submitted additional briefs arguing the issues presented. (Docs. 54, 55, 59, 61, 62). Judge Rush completed a preliminary review of the motions and submitted a report and recommendation to the undersigned. (Doc. 65). In his report and recommendation, Judge Rush recommends that the court deny the Defendants' motions in full. Each Defendant filed exceptions to the report and recommendation. (Docs. 66, 67).

Both Defendants request de novo review of all of the issues presented in their underlying motions and suggestions in support thereof.[1] The Court notes that such a broad review of general and vague objections to the Magistrate's report and recommendation is inappropriate. As the local rules explain, in response to a magistrate judge's report and recommendation, a party may file and serve "written objections which shall *specifically identify* the portions of the proposed findings, recommendations, or report to which objections are made and the basis for such objections." L.R. 74.1(a)(2) (emphasis added). Appellate courts affirm the denial of de novo review where a party's objections lack specificity. *See, e.g., United States v. Prather*, 79 F. App'x 790, 792 (6th Cir. 2003); *Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002); *see also Velez-Padro v. Thermo King De Puerto Rico, Inc.*, 465 F.3d 31, 32 (1st Cir. 2006) (stating that "[c]onclusory objections that do not direct the reviewing court to the issues in controversy do not comply"); *Thompson v. Nix*, 897 F.2d 356, 357-58 (8th Cir. 1990) (reminding parties that "objections must be timely and specific to trigger de novo review by the District Court of any portion of the magistrate's report and recommendation.").

---

[1] Defendant Vetrano's objections state: "Mr. Vetrano requests de novo review by this Court of the arguments made in: ECF Dkt. No. 36 (Vetrano Motion to Suppress); ECF Dkt No. 39 (Vetrano Reply); ECF Dkt. No. 53 [sic] Vetrano Post-Hearing Motion to Suppress); ECF Dkt. No. 61 (Vetrano Reply to Gov't Opp.), and in co-defendant Josh Vawter's Objections to the Magistrate's Report and Recommendation (ECF Dkt. No. 66)." Def. Vetrano's Objs. Rep. and Rec. 1. Defendant Vawter's objections state: "Defendant, Joshua W. Vawter, . . . objects generally to the Magistrate's Report, Recommendations and Order of September 26, 2014 in its entirety (Document 65) and renews his Motion to Suppress Evidence and Statements and/or Dismiss the Indictment (Document 41) . . . ." Def. Vawter's Objs. Rep. and Rec. 1.

2

Accordingly, the Court will address only the specific objections furthered by Defendants. After a de novo review, the Court finds Judge Rush's analysis correct, overrules Defendants' objections, and adopts the report and recommendation of the United States Magistrate Judge.

## ANALYSIS

The objections stated by Defendants can be broken down into the following four categories: (I) unlawful detention, (II) parallel construction, (III) *Franks* hearing, and (IV) equal protection.[2]

### I. Unlawful Detention

Defendants argue that they were unlawfully seized in violation of the Fourth Amendment. They claim that the officer's actions were not justified at the inception of the detention nor were they reasonably related in scope to the circumstances that justified the initial interference.

#### 1. When Fourth Amendment "Seizure" Began

Defendants object to the Judge Rush's finding that the initial encounter between the Defendants and Agent Hodges was "consensual and constitutionally permissible." Defendants argue that they were "seized" from the moment Agent Hodges approached them because no reasonable person in the Defendants' position would have felt free to leave under the circumstances.

---

[2] Defendant Vawter also raised one specific objection as to the Magistrate Judge's findings of fact. Def. Vawter's Objs. Rep. and Rec. 2. He objected to the Magistrate's finding that: "In total, the search revealed 202 bags of high-grade marijuana with an estimated street value of $1.5 million." Rep. and Rec. 6. Specifically, Defendant objects to the estimated street value of the drugs. Upon review of the transcript from the suppression hearing, the Court overrules Defendant Vawter's objection. Contrary to Defendant's argument, the $1.5 million figure was not "disproved on cross-examination." Mr. Scheitlin testified that, from his training and experience, the marijuana was "clearly high-grade marijuana." Tr. 104. He stated that the $1.5 million estimate was based off of "a number of things" and was derived from "a combination of resources that we utilize to come up with, again, an approximate figure." Tr. 106. He agreed that the $1.5 million figure would result in a cost of approximately $7,500 per pound and stated the cost "can range from higher to lower depending upon where you're at." Tr. 107. Because the finding merely states "an *estimated* street value of $1.5 million," because the estimate was from a DEA agent with over two years' experience, and because Defendants presented no evidence as to what an appropriate estimate should be for 202 pounds of high-grade marijuana, the Court holds that the Magistrate Judge's finding of fact was supported by the evidence and appropriate.

"[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person" and the Fourth Amendment is implicated. *Terry v. Ohio*, 392 U.S. 1, 16 (1968). However, the Supreme Court has repeatedly held that mere questioning by a police officer does not constitute a seizure. *Muehler v. Mena*, 544 U.S. 93, 101 (2005). Although "most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response." *I.N.S. v. Delgado*, 466 U.S. 210, 216 (1984) (internal citations omitted). "[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individual's identification; and request consent to search his or her luggage." *Muehler*, 544 U.S. at 101 (quoting *Florida v. Bostick*, 501 U.S. 429, 434-35 (1991)). Only when the officer's "conduct or questioning is so intimidating, threatening, or coercive that a reasonable person would not feel free to leave," has the person been "seized." *U.S. v. Jones*, 269 F.3d 919, 925 (8th Cir. 2001).

Here, the Defendants were not "seized" upon their initial encounter with federal agents. Defendants landed their airplane voluntarily and were nearly finished fueling by the time the federal agents parked their jet. The credible testimony indicates that two agents wearing flight suits and gun belts approached Defendant Vawter's airplane. Another agent, who carried a rifle-type gun, stayed back in the jet at a distance of roughly thirty to forty feet from the Defendants. As the agents approached, they did not run, have their weapons drawn, or suggest that the plane was stolen. Instead, Agent Hodges asked to speak to the pilot and requested identification and certain flight documentation pursuant to federal regulation. He then accompanied Mr. Vawter to the plane as Mr. Vawter retrieved those documents from his wallet. During that time, Agent Hodges witnessed the appearance of the plane, observed Mr. Vawter's behavior, and asked some routine questions concerning Mr. Vawter's flight.

Based on the information observed, the agent made a decision to continue the investigation after checking Mr. Vawter's identification and documentation. "A police officer may conduct a brief, investigatory stop of an individual if the officer reasonably suspects that the individual is involved in criminal activity." *United States v. Lawhorn*, 735 F.3d 817, 820 (8th Cir. 2013) *cert. denied*, 134 S. Ct. 1563, 188 L. Ed. 2d 574 (U.S. 2014). Such a stop "allows an officer with reasonable suspicion to detain an individual in order to ask a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *United States v. Suitt*, 569 F.3d 867, 870-71 (8th Cir. 2009) (internal citations and quotations omitted). When Agent Hodges finished checking Mr. Vawter's documents, asked about contraband on board the airplane, and stated that he was going to request a drug dog to come sniff the exterior of the plane, Mr. Vawter was seized for purposes of the Fourth Amendment. At that point, it was clear that Mr. Vawter's freedom to walk away was restrained.

**2. Whether Investigatory Detention was Supported by Reasonable Suspicion**

Defendants object to the Magistrate's finding of reasonable suspicion. They argue that Judge Rush relied too heavily on the Defendant Vawter's perceived nervousness and that the Court should disregard the paint job and lettering/numbers for reasonable suspicion purposes because the officers knew the airplane was not stolen. According to Defendants, the remaining facts offered to support reasonable suspicion – the confidential informant tip, luggage, and the allegedly false statements – are insufficient to establish more than a "hunch" of illegal activity.

For brief investigatory stops, the Fourth Amendment is satisfied where an officer's action is supported by reasonable suspicion that criminal activity is afoot. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Reasonable suspicion "falls considerably short of satisfying a preponderance of the evidence standard." *Id.* 274. As the Eighth Circuit explained:

5

> For an investigative Terry-type seizure to be constitutional under the Fourth Amendment, an officer must be aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed. Although a reasonable suspicion requires more than an "inchoate hunch," the officer need only articulate some minimal, objective justification for an investigatory stop in order to comply with the Fourth Amendment. Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances. When considering the circumstances involved, due weight must be given "to the factual inferences drawn by the law enforcement officer.

*United States v. Donnelly*, 475 F.3d 946, 952 (8th Cir. 2007) (internal citations and quotations omitted). Reasonable suspicion may be based upon a reasonable mistake of fact, *Williams v. Decker*, 767 F.3d 734 (8th Cir. 2014), or even upon wholly innocent facts when they are viewed through the perspective of an experienced law enforcement officer. *Donnelly*, 475 F.3d at 953; *see also United States v. Wallraff*, 705 F.2d 980, 988 (8th Cir. 1983) ("conduct which would be wholly innocent to the untrained observer . . . might acquire significance when viewed by an agent who is familiar with the practices of drug smugglers and the methods used to avoid detection" (internal quotations omitted)).

Here, Agent Hodges had reasonable suspicion to suspect Defendants were transporting contraband. The following facts combined to establish "an objective and particularized basis for a reasonable suspicion." First, Agent Hodges was aware that the DEA had a lookout on Defendant Vawter's airplane for possible narcotics smuggling. Second, he observed runs and drips on the airplane's exterior, indicating that the airplane was hastily painted; in Agent Hodges' experience in law enforcement, such painting is often done in order to disguise an airplane because aircrafts are listed by their paint, graphics, an N-numbers.[3] Third, Agent Hodges observed military-style duffle bags filling nearly the entire cargo compartment of the

---

[3] Defendants argue that reasonable suspicion cannot rely on this fact because the agents knew the aircraft was not stolen. However, Agent Hodges indicated that, in his experience, shoddy paint jobs often indicate one is trying to "hide" the aircraft. One may try to hide or disguise an airplane for purposes other than to mask stolen property.

6

airplane, from front to back and from bottom to top; persons smuggling narcotics often transport drugs in this manner.[4] Fourth, Defendant Vawter exhibited significant and unusual nervousness including limited eye contact, physically shaking, and continuous fidgeting.[5] Finally, Defendants gave false statements about their recent whereabouts, which the agent knew were false due to tracking surveillance. Based on the totality of the circumstances, the Court finds the officer articulated at least "some minimal, objective justification for an investigatory stop" such that the Fourth Amendment was satisfied.[6]

The Court also overrules, at this juncture, Defendants' argument concerning "zero suspicion searches." Here, there was reasonable suspicion for the detention, as discussed above. Furthermore, contrary to Defendants' assertion, Agent Hodges' testimony concerning a lack of knowledge of "zero suspicion searches" was credible. Moreover, the authorities cited by Defendants related to zero suspicion searches are distinguishable from the case at bar.[7]

### 3. Whether Investigatory Detention turned into De Facto Arrest

---

[4] Defendants argue that there is nothing unusual about finding luggage in an airplane. While this is true, the unusual aspect in the present case was not merely the existence of luggage but the amount, type, and organization of the luggage. As stated in *United States v. Wallraff*, 705 F.2d 980, 988 (8th Cir. 1983), "conduct which would be wholly innocent to the untrained observer . . . might acquire significance when viewed by an agent who is familiar with the practices of drug smugglers and the methods used to avoid detection" (internal quotations omitted).

[5] While Defendants are correct that signs of nervousness should be treated with caution, *Jones*, 269 F.3d at 929, extreme or unusual nervous behavior may be appropriately considered in a reasonable suspicion analysis. *See United States v. Quintero-Felix*, 714 F.3d 563, 567-68 (8th Cir. 2013). Here, the Court finds that physically shaking with nerves based solely on a request to see documentation required to fly an aircraft constitutes unusually nervous behavior.

[6] *See generally United States v. Arvizu*, 534 U.S. 266, 277 (2002); *United States v. Carpenter*, 462 F.3d 981, 987 (8th Cir. 2006); *United States v. Lebrun*, 261 F.3d 731, 733 (8th Cir. 2001).

[7] The memoranda cited discuss situations where law enforcement agencies *stop* the airplane and then check appropriate documentation; here, the agents did not stop Defendants' airplane. Merely requesting certain flight documents and identification from the pilot of a resting airplane is clearly permitted by the Code of Federal Regulations. Additionally, the case cited by Defendants was non-persuasive. It was decided under Illinois case law and involved an immediate de facto arrest (rather than a brief investigatory detention) where "after the defendant had landed and placed his airplane inside the hangar, a military helicopter landed nearby and agents exited, one in full tactical gear. Six or more air agents and ground agents approached the defendant with guns drawn and pointed at the defendant. The defendant was immediately frisked and handcuffed"; here, by contrast, there were two agents, their guns were not drawn, and Defendants were not immediately frisked or handcuffed.

7

Defendants object to the Magistrate's conclusion that the length and manner of the Defendants' detainment was objectively reasonable under *Terry*. Defendant Vetrano claims "defendants were detained far longer than constitutionally acceptable absent intervening reasonable suspicion" and Defendant Vawter states "[c]ontrary to the Magistrate's Report, the agents in this case did not use the least restrictive means of detention and/or investigation[.]"

"An investigative detention may turn into an arrest if it 'lasts for an unreasonably long time or if officers use unreasonable force.' During an investigative stop, officers should 'employ the least intrusive means of detention and investigation, in terms of scope and duration, that are reasonably necessary to achieve the purpose' of the stop." *United States v. Donnelly*, 475 F.3d 946, 953 (8th Cir. 2007) (quoting *United States v. Navarrete–Barron*, 192 F.3d 786, 790 (8th Cir.1999)). In determining whether a detention was reasonable, courts look to the law enforcement purposes to be served by the stop, the time reasonably needed to effectuate such purposes, and whether the police diligently pursued such purposes. *See Williams v. Decker*, 767 F.3d 734 (8th Cir. 2014). While time is an important factor, courts refuse to establish a rigid time limitation for investigative stops. *Id.*

Here, the detention was warranted based upon the officer's reasonable suspicion of drug-related activity, see discussion supra. Agent Hodges acted diligently in confirming or dispelling his suspicions – the total length of the encounter was roughly one hour from initial contact to the drug dog's alert. As previously discussed, Agent Hodges' "suspicions" arose gradually through the course of his legal and consensual inspection of Defendant Vawter's flight documents, along with the accompanying observations and conversations. Thus, the first part of the encounter should not be included in the time because the circumstances, at that point, did not involve a detention. After Agent Hodges determined there was a need for further investigation based on suspicious drug-related factors, he attempted to dispel his suspicions by asking about contraband,

separately questioning the men, and calling for a drug dog.[8] Within thirty-seven minutes of the initial contact, Agent Hodges sought the assistance of a canine free-air sniff. Fifteen minutes later, a K-9 unit arrived on the scene. Within minutes, the canine made a positive, final alert to the presence of narcotics. At that point, the agent's suspicions were confirmed and probable cause existed to search the airplane.

Such a time period is appropriate and there is no other evidence that indicates the Defendants' detainment evolved into a de facto arrest. *United States v. Donnelly*, 475 F.3d 946, 954 (8th Cir. 2007) (holding 80-minute period between arrival on scene and alert of drug dog reasonable); *United States v. Sanchez*, 417 F.3d 971, 976 (8th Cir. 2005) (holding 45-minute period not unreasonable detention); *United States v. Bloomfield*, 40 F.3d 910, 917 (8th Cir. 1994) (holding one-hour period between pulling defendant over and arresting defendant was not an unreasonable period to wait for a drug dog to verify suspicion.); *United States v. Riley*, No. 10–05003–01–CR–SW–RED, 2011 WL 846875 (W.D. Mo. 2011) (holding 43 minutes between initial stop and drug dog arriving on scene reasonable).

## II. Parallel Construction

Defendant Vawter objects that the Magistrate's report "misconstrues the articles and news reports which the Defendant submitted concerning 'parallel construction'" because such techniques were "undoubtedly used in this case." Defendant claims that, under a technique called "parallel construction," government agents are trained to recreate investigative trails in order to cover up where information originated.

---

[8] Defendant Vawter suggests that the agents failed to use the least instrusive means because "agents displayed guns and an automatic weapon and separated the two travelers for questioning while holding them in the hanger." The Court notes that most law enforcement officers display guns and the Court does not see how separating Defendants is overly "intrusive." Furthermore, Defendant Vawter cited no authority to support this proposition. To the contrary, case law indicates that: "In fact, the Supreme Court has lauded the use of drug-sniffing dogs for their unique ability to directly dispel suspicion quickly and with minimal intrusion." *U.S. v. Donnelly*, 475 F.3d 946, 956 n.4 (8th Cir. 2007).

9

After de novo review, the Court agrees with Judge Rush that there is no basis for an assertion of "parallel construction" in the matter before the Court. First, both agents who took the stand denied knowledge of such techniques and Defendants presented no evidence that such techniques occurred in this case, other than mere speculative and generalized arguments within their briefs. Second, even assuming such techniques did occur in this case, they would not affect the reasonable suspicion analysis; the officer need only "articulate some minimal, objective justification for an investigatory stop." Third, to the extent that Defendants seek an investigation into the DEA and its practices, such an investigation is not within the province of the court. Finally, if Defendants claim they were denied certain documents to which they are entitled through discovery, then the appropriate motion is a motion to compel rather than motion to suppress.[9]

### III. *Franks* Hearing

Defendants next object to the Magistrate's recommendation to deny a *Franks* hearing. Defendants claim due process requires the prosecution to disclose the true source of information against them, including the purported unidentified informant. Defendants argue that there is "no doubt that the information allegedly provided by the alleged informant caused the defendants to be stopped" and that it "colored" the way Agent Hodges viewed the facts of the case.

Defendants are not entitled to a *Franks* hearing. The *Franks* decision allows a defendant to request an evidentiary hearing where the defendant can show "that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *Franks v. Delaware*, 438 U.S. 154, 154 (1978). The Eighth Circuit explained that:

---

[9] The news articles cited by Defendant note potential consequences of "parallel construction" in terms of pretrial discovery rules – i.e. access to information that could be useful to criminal defendants. For example, where there is an ongoing investigation and the investigating officials tell other officials to be at a certain location at a certain time and advise to stop the Defendant, who is suspected of drug-related activity, for any lawful purpose, such "parallel construction" may have implications upon when the underlying investigation began, which is relevant to discovery.

> In order to be entitled to a hearing under Franks v. Delaware, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978), the defendant must make a "substantial preliminary showing" of a false or reckless statement or omission and must further show that the alleged false statement or omission was necessary to a finding of probable cause. United States v. Fairchild, 122 F.3d 605, 610 (8th Cir.1997). The "substantial preliminary showing" requirement needed to obtain a Franks hearing is not lightly met. United States v. Hiveley, 61 F.3d 1358, 1360 (8th Cir.1995).

*United States v. Moore*, 129 F.3d 989, 992 (8th Cir. 1997), as amended on denial of reh'g and reh'g en banc (Dec. 16, 1997).

Defendants clearly failed to show that the alleged false statement or omission was necessary to a finding of probable cause. The only information contained in the warrant affidavit concerned the positive canine alert. See *United States v. Donnelly*, 475 F.3d 946, 955 (8th Cir. 2007) ("Assuming that the dog is reliable, a dog sniff resulting in an alert on a container, car, or other item, standing alone, gives an officer probable cause to believe that there are drugs present."). Thus, even redacting any information related to the confidential informant, the search warrant affidavit still contains sufficient information to establish probable cause. *United States v. Rodriguez*, 188 F. App'x 551, 553 (8th Cir. 2006). Defendants argue that the information from the confidential informant precipitated the detention of the defendants and thereby influenced the decision to call for a drug dog sniff, the alert of which was used for the warrant affidavit. This argument is too attenuated to provide a "substantial preliminary showing" that the alleged "false statement or omission" by the confidential informant was necessary to a finding of probable cause.

### IV. Equal Protection

Defendants object to the Magistrate's recommendation that Defendants' equal protection argument is baseless. Defendants reassert their belief that memos from Attorney General Eric Holder and Deputy Attorney General David Odgen "encourage federal prosecutors to defer to state law in decided whether or not to bring federal criminal charges for possession or sale of

11

marijuana." Defendants essentially argue that these "de facto regulations" result in selective prosecution on the basis of state citizenship, which is impermissible under equal protection principles.

An equal protection analysis is the same under the Fifth Amendment as it is under the Fourteenth Amendment because "a discriminatory application of law by the federal government, where unjustifiable, can constitute a denial of due process." See *Buckley v. Valeo*, 424 U.S. 1, 93 (1976); *Torres v. Shalala*, 48 F.3d 887, 890 (5th Cir. 1995).[10] "[U]nless a classification warrants some form of heightened review because it jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification rationally further a legitimate state interest." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). The burden is on the person attacking the statute to "negative every conceivable basis which might support it, whether or not the basis has a foundation in the record." *Heller v. Doe by Doe*, 509 U.S. 312, 320-21 (1993).

Selective prosecution claims are especially difficult for a defendant to bring in light of the separation of powers concerns and the competence of courts. As the Supreme Court explained:

> A selective-prosecution claim asks a court to exercise judicial power over a "special province" of the Executive. The Attorney General and United States Attorneys retain broad discretion to enforce the Nation's criminal laws. They have this latitude because they are designated by statute as the President's delegates to help him discharge his constitutional responsibility to "take Care that the Laws be faithfully executed." As a result, the presumption of regularity supports their prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties. In the ordinary case, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion. One of these constraints, imposed by the equal protection component of the Due Process Clause of the Fifth Amendment, is that the decision whether to prosecute may not be based on an unjustifiable standard

---

[10] However, it has been noted that "there may be overriding national interests which justify selective federal legislation that would be unacceptable for an individual State." *Hampton v. Mow Sun Wong*, 426 U.S. 88, 100, 96 S. Ct. 1895, 1904, 48 L. Ed. 2d 495 (1976).

such as race, religion, or other arbitrary classification. . . . In order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present clear evidence to the contrary.

*United States v. Armstrong*, 517 U.S. 456, 464-65 (1996) (internal quotations and citations omitted). Furthermore, certain factors are not readily susceptible to competent court analysis, for example, "the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan." *Wayte v. United States*, 470 U.S. 598, 607-08 (1985).

As such, the standard to prove selective prosecution is "a demanding one." *Armstrong*, 517 U.S. at 464. "To establish a prima facie case, a defendant must demonstrate: 1) that he has been singled out for prosecution while others similarly situated have not been prosecuted for similar conduct and 2) that the government's action in thus singling him out was based on an impermissible motive such as race, religion, or the exercise of constitutional rights. *United States v. Parham*, 16 F.3d 844, 846 (8th Cir. 1994). A person is "similarly situated" for selective prosecution purposes where the person is "engaged in the same type of conduct, which means that the comparator committed the same basic crime in substantially the same manner as the defendant," where the "prosecution of that individual would have the same deterrence value and would be related in the same way to the Government's enforcement priorities and enforcement plan," and where "the evidence was as strong or stronger than that against the defendant." *United States v. Smith*, 231 F.3d 800, 810 (11th Cir. 2000). Furthermore, the government's mere "conscious exercise of some selectivity in enforcement is not itself a federal constitutional violation." *United States v. Niemiec*, 611 F.2d 1207, 1209 (7th Cir. 1980) (citing *Oyler v. Boles*, 368 U.S. 448, 456 (1962)).

Based on the foregoing, it is apparent that Defendants fail to argue a sufficient selective prosecution or other equal protection claim concerning the enforcement of federal marijuana laws. Defendants failed to show any other person similarly situated who was not prosecuted.

13

*See United States v. Brown*, 424 F. App'x 909, 912 (11th Cir. 2011) (denying selective prosecution under because defendant failed to show he was "similarly situated" to people who have never been prosecuted for violating § 841(a)). Defendants also failed to show discriminatory purpose; rather, the memoranda "articulate several broad enforcement priorities that are intended to inform charging decisions regarding marijuana-related crimes and focus prosecutorial efforts on marijuana-related activities that implicate the most significant dangers associated with marijuana, regardless of where those activities occur," which is a rational exercise of prosecutorial discretion, and which the Court is not competent to address. *United States v. Heying*, No. 14-CR-30 JRT SER, 2014 WL 5286153 (D. Minn. Aug. 15, 2014) report and recommendation adopted, No. CRIM 14-30 1 JRT/SER, 2014 WL 5286155 (D. Minn. Oct. 15, 2014); *see also United States v. Canori*, 737 F.3d 181, 184-85 (2d Cir. 2013) (holding that the memoranda at issue do not legalize marijuana or create a constitutional crisis).

## DECISION

After de novo review, the Court agrees with the report and recommendation issued by the United States Magistrate Judge, and in accordance with such:

**IT IS HEREBY ORDERED** that Defendants' objections (Docs. 66, 67) to the report and recommendation are **OVERRULED.**

**IT IS FURTHER ORDERED** that the report and recommendation of the United States Magistrate Judge (Doc. 65) is **ADOPTED.**

**IT IS FURTHER ORDERED** that Defendants' Motions to Suppress and/or Dismiss the Indictment (Docs. 36, 41) are **DENIED**.

**IT IS SO ORDERED:**

Date: October 24, 2014

                                             */s/ Douglas Harpool*
                                             DOUGLAS HARPOOL
                                             UNITED STATES DISTRICT JUDGE